*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BILL YANKEE, | ) | |
| | ) | Supreme Court No. S-16098 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-14-00681 CI |
| v. | ) | |
| | ) | O P I N I O N |
| CITY AND BOROUGH OF | ) | |
| JUNEAU, CHRIS GILBERTO, | ) | No. 7206 – October 20, 2017 |
| and ANN GILBERTO, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Louis J. Menendez, Judge.

Appearances: Robert S. Spitzfaden, Gruening & Spitzfaden, APC, Juneau, for Appellant. Robert H. Palmer, III, Assistant Municipal Attorney, and Amy Gurton Mead, Municipal Attorney, Juneau, for Appellee City and Borough of Juneau. No appearance by Appellees Chris Gilberto and Ann Gilberto.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.     INTRODUCTION

A landowner contends that his neighbors' fence violates two restrictive plat notes. The neighboring properties are in two different subdivisions, and the landowner

is therefore not bound by the same restrictive plat notes that he seeks to enforce against his neighbors. The landowner complained about the fence to the Director of Juneau's Community Development Department, but the Director responded that the fence was allowed, citing longstanding policy.

The landowner appealed to the Planning Commission, which affirmed the Director's decision. The landowner next appealed to the Juneau Assembly, which rejected his appeal for lack of standing. The landowner appealed this decision to the superior court, which affirmed the Assembly's reliance on standing as grounds to reject the appeal. The landowner appeals to us.

We conclude that the Director's decision was an appropriate exercise of his enforcement discretion, not ordinarily subject to judicial review. On that alternative ground we affirm the superior court's dismissal of the appeal. We decline to address the standing issue on which the Assembly and the superior court based their decisions.

## II. FACTS AND PROCEEDINGS

### A. Facts

An undeveloped greenbelt buffer runs between Bill Yankee's property and the back of Chris and Ann Gilbertos'. The two properties are in different subdivisions and therefore subject to different covenants: Yankee's property is in the Nunatak Terrace Subdivision whereas the Gilbertos' is in the Montana Creek Subdivision.

The Gilbertos built a fence along their side of the greenbelt buffer. According to the Gilbertos, they checked with the Community Development Department (CDD) of the City and Borough of Juneau (CBJ) before building the fence and were repeatedly assured that it was allowed. But Yankee — concerned that the fence interfered with the movement of ducks through the greenbelt — asserted that it violated

two plat notes[1] on the recorded plat of the Montana Creek Subdivision applicable to its southern boundary line, where it adjoins Nunatak Terrace and another subdivision. One of the plat notes requires a "30 [foot] 'no-build' structure setback"; the other requires "no disturbance to [a] 20 [foot] natural green belt & visual buffer easement."[2]

## B. Proceedings

Yankee first brought his complaint about the Gilbertos' fence to the CDD. The Director's response, in the form of a four-page letter addressed to Yankee, began by stating that its purpose was "to clarify the [CDD] policy regarding fences and to formally notify you of my decision as CDD Director regarding this case." What followed was a

---

[1]     A plat is a scale drawing — in this case of a subdivision. A note on that plat acts as a restrictive covenant. *See* City and Borough of Juneau Code (CBJ) § 49.15.440(4) (March 2013) (renumbered with slight language changes in CBJ § 49.15.412(b) (June 2017)) ("When such a condition of approval [of a subdivision's final plat] entails a restriction upon the use of all or part of the property being subdivided, a note specifying such restrictions shall be placed on the face of the plat. Such note shall constitute a restrictive covenant in favor of the municipality and the public, and shall run with the land, enforceable against all subsequent owners."). Many provisions in the 2013 version of the code, in effect when Yankee first complained to the CDD, remain the same in the current code. We note where the versions differ but for simplicity refer to the CBJ in the present tense.

[2]     These plat notes summarize conditions that were explained in more detail by CDD staff during the plat approval process:

> The concept plan must be modified to include a greenbelt and visual buffer setback for all lots on the outer perimeter of the concept plan site including Montana Creek Road. The setback shall provide that no building or structure may be located closer than 30 feet to a perimeter lot line and that the outermost 20 feet of the setback area must be left in natural vegetation and topography. The setback area . . . shall be maintained to preserve an effective visual screening along the perimeter using vegetation.

description of the subdivisions' development and an explanation of CBJ's fence policy going back "to at least 1999." The Director explained that the Montana Creek plat notes were primarily intended to "ensure that existing vegetation would be preserved" in the greenbelt buffer area so that neighboring properties would be shielded from the new and denser Montana Creek subdivision; he explained that fences, with some limitations, were actually consistent with those purposes. The Director's decision concluded:

> The fence in this particular case was constructed in such a way as to be consistent with the standing CDD policy and appears to be of minimal visual impact since it is wire and less than five feet tall. The wire fence allows for the vegetative buffer to show through unlike other fences that might allow for greater privacy. It appears reasonable that the property owner would want to denote where his property line is and where the neighboring properties begin and to do this [in] a manner that does not impair the neighbor's enjoyment of the greenbelt, since the same right is afforded to the non-Montana Creek subdivision property owner.

Yankee appealed the Director's decision to the CBJ Planning Commission. The Commission rejected his appeal on its merits, finding that the plat notes were ambiguous and that Yankee failed to demonstrate that the fence was prohibited. Yankee next appealed to the CBJ Assembly, which also rejected his appeal, though not on the merits. The Assembly relied instead on a memorandum from the CBJ Law Department concluding that Yankee lacked standing to enforce the plat notes because he did not own property in Montana Creek Subdivision.

Yankee then appealed to the superior court, which affirmed the Assembly's decision that he lacked standing. Yankee appealed to this court.

## III.  STANDARD OF REVIEW

"When the superior court acts as an intermediate court of appeals in an administrative matter, we independently review the merits of the agency's decision."[3] Because the scope of appellate jurisdiction "does not 'implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function,' we will substitute our independent judgment for that of the agency."[4]

Although courts generally refrain from reviewing an executive agency's exercise of discretionary enforcement authority, we have observed that we may review such an exercise to insure its "conformity with law and that it is not so capricious or arbitrary as to offend due process."[5]

## IV.  DISCUSSION

Yankee's opening brief in this appeal focused on the issue of standing — the sole ground on which the Assembly and the superior court declined to hear the merits of his appeal from the Director's decision.  CBJ, in its appellee's brief, raised the issue of subject matter jurisdiction; it characterized the Director's decision as either (1) an attempt to adjudicate a private dispute, for which the CDD lacked jurisdiction; (2) a "policy advice letter" which the CDD had authority to issue but from which there was no right of appellate review; or (3) a discretionary enforcement decision which the CDD had authority to make but from which, again, there was no right of appellate review.  In his reply brief Yankee pushed back against the characterization of the Director's decision

---

**3**      *S. Anchorage Concerned Coalition, Inc. v. Municipality of Anchorage Bd. of Adjustment*, 172 P.3d 768, 771 (Alaska 2007) (citing *Williams v. Abood*, 53 P.3d 134, 139 (Alaska 2002)).

**4**      *Id.* (quoting *Alaska Pub. Emps. Ass'n v. State*, 831 P.2d 1245, 1247 (Alaska 1992)).

**5**      *Vick v. Bd. of Elec. Examiners*, 626 P.2d 90, 93 (Alaska 1981) (citing *K & L Distribs., Inc. v. Murkowski*, 486 P.2d 351, 358 (Alaska 1971)).

as an "advisory opinion" (or "advice letter"), contending that although the decision "clarifie[d] the CDD fence policy," in doing so it resolved Yankee's complaint "pursuant to the Director's enforcement authority."

We agree with CBJ that the dispositive issue is one of reviewability. We hold that the Director's decision was an appropriate exercise of his enforcement discretion that we should not review. In reaching this holding we do not find it necessary to consider whether the decision was properly appealable within the CBJ administrative hierarchy — from the CDD to the Planning Commission to the Assembly — nor do we decide the standing issue that the superior court found dispositive. We focus only on whether a discretionary enforcement decision, with whatever layers of review the executive has given it, should also be subject to our review.

## A.    The Director Has Enforcement Authority Over Matters Relevant To Yankee's Complaint.

The Director's consideration of the case was apparently prompted first by communications from the Gilbertos, who, after receiving complaints from Yankee, sought reassurances from the CDD that their fence was allowed. The CDD then heard from Yankee himself by telephone. According to a CDD planner's record of the conversation, Yankee relied on the Montana Creek plat notes to support his position that the fence should "come down ideally" and "[i]f that can't be done, then he'd like holes cut into the fence so that nesting ducks are able to travel back and forth over the ponds between the two lots." In the context of the CDD's authority, as explained below, we view Yankee's request as one for enforcement: a request that the CDD, by whatever means, require the Gilbertos to remove or significantly alter their fence.[6]

---

[6]    On appeal Yankee contends that he was seeking a change in CBJ policy and that he recognized that either he or the CDD would have to follow up any policy change with an enforcement action directed specifically against the Gilbertos' fence. At the
(continued...)

To appropriately categorize the Director's response, we must first review the sorts of decisions the Director is authorized to make. The City and Borough of Juneau Code § 49.10.500 authorizes the Director "to carry out all of the duties as set forth in [title 49] and title 19." We find no relevant authority in title 19 ("Building Regulations") and therefore look to title 49. As relevant here, that title gives the Director authority in three main areas: (1) permitting;[7] (2) approval of "minor subdivisions" and zoning districts;[8] and (3) enforcement.[9] It is evident that the Director's decision on Yankee's complaint was not grounded in his permitting authority. Although CBJ § 49.15.310 grants such authority for individual "minor developments," fences under six feet, like the Gilbertos' five-foot fence, do not require a permit under CDD policy. Nor did Yankee's complaint implicate the Director's approval authority for "minor subdivisions" and zoning districts.[10] We conclude that it was the Director's enforcement authority that allowed him to consider and respond to Yankee's complaint.

---

[6](...continued)
time, however, Yankee appeared to be asking the CDD to take immediate action. The one relevant writing of his that is in our record and predates the Director's decision — an email to the Director — states that he is waiting for the "the decision on said fence" but does not understand "your office allowing this fence to remain in place (clearly a violation of subdivision plat) while your staff conducts an open-ended study looking for any criteria to 'authorize' this fence," and that he is "again requesting that this 'setback' be honored, while the above research/study is conducted." This is consistent with the CDD planner's record that "Mr. Yankee wants the fence to come down ideally."

[7]     CBJ § 49.15.310.

[8]     CBJ § 49.10.510.

[9]     CBJ §§ 49.10.600–.660.

[10]     *See* CBJ § 49.10.510.

As Yankee asserts, the Director's enforcement authority extends to potential plat note violations,[11] for which the law provides a variety of enforcement tools.[12] The Director thus had the authority to hear and respond to Yankee's complaint. Indeed, Yankee agrees that the Director's decision of his complaint was an exercise of enforcement authority, though he disputes the conclusion that it should therefore escape judicial review.[13] But as discussed in the next section, we disagree. The Director's decision not to take enforcement action against the Gilbertos' fence was a discretionary one that is not ordinarily subject to judicial review.

## B.   We Decline To Review The Director's Decision.

CBJ argues that the Director's decision — as an "advice letter" on CDD's enforcement policy — was not in fact appealable within the CBJ administrative hierarchy. Yankee points to CBJ ordinances that provide for appeals as a matter of right

---

[11]    *See* CBJ § 49.15.440(4) (March 2013) (renumbered with slight language changes in CBJ § 49.15.412(b) (June 2017)) ("Any such restrictive covenant may be enforced against the subdivider or any subsequent owner by the municipality by injunction or other appropriate action, in the same manner as a permit or permit condition, pursuant to CBJ 49.10.600–660 . . . .").

[12]    *See* CBJ § 49.10.600(a) (emergency powers); CBJ § 49.10.620(a) (compliance order); CBJ § 49.10.630 (civil action); CBJ § 49.10.640 (criminal penalties); CBJ § 49.10.650 (inspection warrant).

[13]    To distinguish the Director's decision from a statement of CBJ policy — an unreviewable "advisory opinion" — Yankee argues, for example, that "[t]he Decision clarifies the CDD fence policy resolving, *pursuant to the Director's enforcement authority*, the complaint brought by Mr. Yankee"; he also faults CBJ for not citing cases in its appellee's brief holding that "subject matter jurisdiction [was] lacking when an administrative official with jurisdiction over enforcement *exercised th[at] enforcement authority*." (Emphasis added.)

to the Commission and then to the Assembly.[14]  But whether CBJ could and did authorize various levels of *administrative* review of the Director's decision is of no consequence to us if the decision is of a type that is not ordinarily subject to further appellate review in the courts.

As explained above, we view the Director's decision as an exercise of his enforcement authority, that is, a decision not to act on Yankee's complaint.  Generally, courts decline to review executive-branch decisions *not* to prosecute an individual or *not* to enforce a law under particular circumstances.  While issues of enforcement discretion arise more often in the criminal context,[15] our cases provide a framework for considering them in the civil context as well.  In *Public Defender Agency v. Superior Court, Third Judicial District*, we considered whether the superior court could order the attorney general to prosecute a civil contempt proceeding for a parent's failure to pay child support.[16]  We held it could not.[17]  We observed that under the common law the attorney general's "discretionary control over the legal business of the state, both civil and

---

[14]     *See* CBJ § 49.20.110(a) ("Review by the commission of a decision of the director[] may be requested by filing a notice of appeal . . . .  The appeal shall be heard unless it presents only minor or routine issues . . . ."); CBJ § 49.20.120 ("Appeal to the assembly is a matter of right.").

[15]     *See, e.g.*, *State v. District Court*, 53 P.3d 629, 631 (Alaska App. 2002) ("Both the Alaska Supreme Court and [the Court of Appeals] have declared that charging decisions are committed to the discretion of the executive branch; so long as these decisions are exercised within constitutional bounds, they are not subject to judicial control or review.").

[16]     534 P.2d 947, 948 (Alaska 1975).

[17]     *Id.* at 950-51.

criminal, includes the initiation, prosecution, and disposition of cases."[18] We adopted the rule that "[w]hen an act is committed to executive discretion, the exercise of that discretion within constitutional bounds is not subject to the control or review of the courts," because "[t]o interfere with that discretion would be a violation of the doctrine of separation of powers."[19] We concluded that the superior court's order requiring the attorney general to prosecute a particular case of nonsupport "overstepped this line": "although we have jurisdiction to entertain this case and to find, as we have, the existence of legal authority [for the attorney general to bring the nonsupport action], we do not have power to control the exercise of the [a]ttorney [g]eneral's discretion as to whether he will take action in any particular cases of contempt for non-support."[20]

We addressed a similar issue in *Vick v. Board of Electrical Examiners*, where we considered the scope of appellate authority over a licensing board's decision — based on the recommendation of an investigative division — not to commence a license revocation proceeding.[21] We noted that "we will sometimes inquire into the basis of an agency's decision to assure that it is in conformity with law and that it is not so

---

[18]     *Id.*

[19]     *Id.*

[20]     *Id.* at 951; *see also Ross v. U.S. Attorney's Office*, 511 F.2d 524, 525 (9th Cir. 1975) (per curiam) (recognizing the "well-settled principle that mandamus does not lie to compel a United States District Attorney to perform a discretionary act"); *State v. Williams*, 356 P.3d 804, 808 (Alaska App. 2015) ("The decision whether to actively participate in the prosecution of any given case is discretionary on the part of the executive branch." (citing *Public Defender*, 534 P.2d at 950-51)).

[21]     626 P.2d 90, 91-92 (Alaska 1981).

capricious or arbitrary as to offend due process,"[22] but we also observed that "the extent of judicial review of discretionary determinations of an agency must necessarily vary with the subject matter."[23] That is, "[w]hen a matter falls within an area traditionally recognized as within an agency's discretionary power, courts are less inclined to intrude than when the agency has acted in a novel or questionable fashion."[24] We explained:

> When an agency functions to protect the public in general, as contrasted with providing a forum for the determination of private disputes, the agency normally exercises its discretion in deciding whether formal proceedings should be commenced. In matters of occupational licensure the decision to initiate proceedings for revocation or suspension is comparable to the function of a public prosecutor in deciding whether to file a complaint. Questions of law and fact, of policy, of practicality, and of the allocation of an agency's resources all come into play in making such a decision. The weighing of these elements is the very essence of what is meant when one speaks of an agency exercising its discretion.[25]

Notwithstanding this discussion of the limits on appellate review, we considered under the abuse of discretion standard the appellant's claims in *Vick* that the licensing board had failed to pursue certain relevant information; we concluded that "the board and the

---

**22**      *Id.* at 93 (citing *K & L Distribs., Inc. v. Murkowski*, 486 P.2d 351, 358 (Alaska 1971)).

**23**      *Id.*

**24**      *Id.*

**25**      *Id.* (footnote omitted).

division did consider the matters put before them and that no abuse of discretion has been demonstrated."[26]

A few years later the United States Supreme Court held in *Heckler v. Chaney* that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[27] As we did in *Vick*, the Court highlighted the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."[28] The Court also observed "that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect"; whereas "when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner."[29] But the *Heckler* Court noted that not every enforcement decision by an executive agency is by definition unreviewable: the legislature could empower courts to review such decisions "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."[30]

---

[26] *Id.*

[27] 470 U.S. 821, 831 (1985) (citing cases).

[28] *Id.*

[29] *Id.* at 832 (emphasis in original).

[30] *Id.* at 833; *see also Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 380 (2d Cir. 1973) ("In the absence of statutorily defined standards governing reviewability, or regulatory or statutory policies of prosecution, the problems inherent in the task of supervising prosecutorial decisions do not lend themselves to resolution by the judiciary.").

As suggested in *Heckler*, we have reviewed agency decisions when the legislature has statutorily narrowed or eliminated the agency's enforcement discretion. In *State, Department of Fish & Game, Sport Fish Division v. Meyer*, we reviewed a case-closing order of the Alaska State Commission for Human Rights, concluding that the agency's compliance with the Human Rights Act did not "involve the exercise of prosecutorial discretion at all."[31]  The Commission's case-closing decisions were reviewable because "the [Human Rights Act] grants no discretion to discontinue the process once the investigator finds substantial evidence of discrimination, unlike the statutes at issue in *Vick* and *Heckler*."[32]

---

[31]   906 P.2d 1365, 1373-74 (Alaska 1995) (noting the compulsory language of the agency's statutory mandate and observing that "if the Commission wants its staff to have this discretionary authority, it must be obtained from the legislature, not the judiciary"), *superseded by statute*, AS 18.80.112(b), *as stated in Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 914 n.52 (Alaska 2016).

[32]   *See id.* at 1373; *see also Toliver v. Alaska State Comm'n for Human Rights*, 279 P.3d 619, 623-24 (Alaska 2012) (highlighting the mandatory language in the Human Rights Act regarding the Commission's investigations).  We also review for abuse of discretion Bar Counsel's decision to close a grievance investigation or to not pursue a complaint. *See McGee v. Alaska Bar Ass'n*, 353 P.3d 350, 352, 354 (Alaska 2015) ("Bar Counsel's decision to close McGee's grievance without a formal investigation was not arbitrary or capricious, and we see no breakdown in the grievance process warranting interference with Bar Counsel's decision."); *Anderson v. Alaska Bar Ass'n*, 91 P.3d 271, 272 (Alaska 2004) ("[W]e conclude that Bar Counsel did not abuse his discretion in declining to accept the grievance for investigation.").  But attorney discipline cases are much different from ordinary administrative appeals due to our inherent authority to regulate the practice of law; we review attorney discipline cases directly. *See McGee*, 353 P.3d  at 351 ("In *Anderson v. Alaska Bar Ass'n* we held that there was no right to appeal grievance-closing decisions to the superior court, but . . . we would directly review such decisions."); *Anderson*, 91 P.3d at 272 ("[G]rievance-closing decisions under Bar Rule 22(a) may, upon timely request of a complainant, be reviewed by this court.").

Our review of these cases convinces us that we should not review the CDD Director's decision in this case. First, unlike the Human Rights Act at issue in *Meyer*,[33] the CBJ grants the CDD and its Director broad discretion in determining whether to take action regarding potential violations of the land use code.[34] Thus even if we were convinced that the Director's interpretation of the plat notes was incorrect, we would not be in a position to second-guess his discretionary exercise of enforcement authority;[35] whether to take action against the Gilbertos' fence would still depend on "[q]uestions of . . . policy, of practicality, and of the allocation of [the] agency's resources," and "[t]he weighing of these elements is the very essence of what is meant when one speaks of an agency exercising its discretion."[36] Furthermore, we recognized in *Vick* that this

---

[33]      906 P.2d at 1372-74.

[34]      *See* CBJ § 49.10.600(a) ("When the department finds . . . that a person is causing . . . a condition or activity which, *in the judgment of the department*, presents an imminent or present danger to the health, safety or welfare of the people . . . , and it appears to be prejudicial . . . to delay action until an opportunity for a hearing can be provided, the department, without prior hearing, *may* order that person by notice to discontinue, abate or alleviate the condition or activity." (emphasis added)); CBJ § 49.10.620(a) ("When, *in the opinion of the department*, a person is violating . . . a provision of this title, . . . the department *may* notify the person of its determination by personal service, or certified mail." (emphasis added)).

[35]      *See Falls Rd. Cmty. Ass'n v. Baltimore Cty.*, 85 A.3d 185, 201-02 (Md. 2014) (holding that County could not be required to pursue zoning enforcement action, due to its discretionary nature, and analogizing to the discretion "of a State's Attorney who must decide which criminal cases to prosecute").

[36]      *Meyer*, 906 P.2d at 1373 (quoting *Vick v. Bd. of Elec. Exam'rs*, 626 P.2d 90, 93 (Alaska 1981)); *cf. Newman v. United States*, 382 F.2d 479, 482 (D.C. Cir. 1967) (explaining that "while [prosecutorial] discretion is subject to abuse or misuse just as is judicial discretion, deviations from [a prosecutor's] duty as an agent of the Executive are to be dealt with by his superiors" and "no court has any jurisdiction to inquire into or
(continued...)

enforcement discretion is due more judicial deference "[w]hen an agency functions to protect the public in general, as contrasted with providing a forum for the determination of private disputes";[37] such is the case here, as the CDD does not provide an adjudicative forum. And Yankee does not dispute that the Director's decision was "within an area traditionally recognized as within [the CDD's] discretionary power," meaning that we "are less inclined to intrude than when the agency has acted in a novel or questionable fashion."[38]

It is also significant that the Director's decision was not an exercise of coercive power, but rather a decision to continue the status quo; as noted in *Heckler v. Cheney*, the lack of an "action" gives the courts less of "a focus for judicial review, inasmuch as the agency must have exercised its power in some manner."[39] Furthermore, we do not see, nor does Yankee argue, that the Director's decision was so arbitrary or capricious as to implicate due process concerns.[40] And importantly, while the appellant in *Vick* lacked another vehicle for relief outside of the administrative appeal process,[41] Yankee has another option — a direct suit against the Gilbertos in superior court, in

---

[36](...continued)
review [a prosecutor's] decision"); James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 HARV. L. REV. 1521, 1546 (1981) ("Courts often justify their refusal to review prosecutorial discretion on the ground that separation-of-powers concerns prohibit such review.").

[37]      626 P.2d at 93.

[38]      *See id.*

[39]      470 U.S. 821, 832 (1985).

[40]      *See Vick*, 626 P.2d at 93.

[41]      *Id.* at 92 (noting appellant's concession "that the final decision to revoke or suspend a license lies within the discretion of the [Board of Electrical Examiners]").

which he can litigate his standing to enforce the Montana Creek plat notes and whether his interpretation of those notes is the correct one.[42]

We conclude, therefore, that the Director's decision in this case, as a discretionary exercise of his enforcement authority, should not be subject to judicial review.

## V.    CONCLUSION

We AFFIRM on other grounds the superior court's dismissal of Yankee's appeal.

---

[42]    CBJ § 49.15.440(4) (March 2013) (renumbered with slight language changes in CBJ § 49.15.415(b) ( June 2017)) ("Any such restrictive covenant may be enforced against the subdivider or any subsequent owner . . . by any specifically affected member of the public.").