*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DEANNA SMITH, | ) | |
| | ) | Supreme Court No. S-18340 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-04293 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | No. 7750 – February 21, 2025 |
| | ) | |
| Appellee. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Eric Croft, The Croft Law Office, Anchorage, for Appellant. Mark Cucci, Chief Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

MAASSEN, Chief Justice.

## I.      INTRODUCTION

A man on probation was subject to a domestic violence protective order (DVPO) that required him to give a day's notice to security personnel whenever he needed to visit the medical center where his former girlfriend worked. The woman alleges that the man violated this notice provision many times over a three-year period by coming to her workplace unannounced or with insufficient notice. The man's

probation officer investigated the alleged violations that were brought to her attention, but she decided not to revoke the man's probation or otherwise penalize him.

The woman brought suit against the probation officer and the Alaska Department of Corrections (DOC) for their allegedly negligent supervision, claiming that the man's repeated violations of the DVPO caused her severe emotional distress and ultimately cost her her job.  The superior court granted summary judgment for the State, determining that there were no genuine issues of material fact, that the probation officer fulfilled her duty of reasonable care, and that her actions were also shielded by discretionary function immunity.  The woman appealed.

We conclude that there is no genuine issue of material fact to preclude summary judgment for the State on whether the probation officer fulfilled her operational duty to investigate the alleged violations that were brought to her attention. We further conclude that the probation officer's subsequent decisions were of the sort committed to executive branch employees and thus shielded from suit by discretionary function immunity.  Agreeing with the superior court, we affirm its grant of summary judgment.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Initial assault and Smith's domestic violence protective orders against Harrison

Kosmos Harrison and Deanna Smith were in a romantic relationship and have a child together.  In December 2012 Harrison violently assaulted Smith, seriously

injuring her.[1]  He was convicted of second-degree assault and sentenced to eight years' imprisonment with six years suspended.[2]

Smith was granted an ex parte DVPO the day after the assault, then long-term DVPOs that were either issued or extended year to year through 2016.  In 2013, while Harrison was still incarcerated, Smith began working for Southcentral Foundation (Southcentral), located in Anchorage on the Alaska Native Health Campus that includes the Alaska Native Medical Center (ANMC).

In April 2014 Harrison was released from prison, on both mandatory parole and probation conditions.[3]  His probation conditions required, among other things, that he "[c]omply with all municipal, state and federal laws" and that he "[a]bide by any special instructions given by the court or any of its duly authorized officers,

---

[1]    *See Harrison v. State*, No. A-11849, 2017 WL 5186308, at *1 (Alaska App. Nov. 8, 2017).  During the incident Harrison "grabbed Smith's arm and twisted it behind her back," "grabbed her by the hair and slammed her head against the kitchen cabinet and countertop," and forced food and a dishrag into her mouth. *Id.*  Their child was awake in the home during the assault. *Id.*  "Smith was taken to the hospital, where she was treated for injuries to her head, face, neck, shoulder, arm, and hand.  Later, when Smith took a shower, clumps of her hair came out.  Smith eventually required surgery to repair the injury to her shoulder." *Id.*

[2]    *Id.* at *2.

[3]    The State conduct at issue here occurred while Harrison was on probation, his period of mandatory parole having expired in December 2014.  We recognize that there are "prominent and significant" differences between probation and parole. *State v. Staael*, 807 P.2d 513, 517 & n.5 (Alaska App. 1991).  But the duties of probation and parole officers do not differ in any way meaningful to our analysis. *See, e.g., State v. Howard*, 357 P.3d 1207, 1209 (Alaska App. 2015) (observing that although defendant "faced different consequences for violating his parole and probation, the same person served as his parole and probation officer, and that person was simultaneously tasked with overseeing [the defendant's] compliance with both his parole and probation conditions" (first citing AS 33.05.045(5) (providing that probation officer supervising parolees is deemed parole officer); and then citing AS 33.16.190 (providing that person appointed as probation officer or parole officer may discharge duties of either office))).

including probation officers of the Department of Corrections."  In the years to follow Harrison had a number of probation officers, but the one relevant to this appeal is Eileen Farrar, who supervised him in 2015 and 2016.

A few weeks after Harrison's release from prison, Smith saw his car parked next to hers on the medical campus.  Both Harrison and his mother were entitled to receive treatment at ANMC, but Harrison denied knowing that Smith worked on the medical campus, as the DVPO then in effect showed her working at a medical office in another part of town.  The superior court accordingly modified the DVPO in August 2014, adding the provision that "Harrison is required to notify security at least one day in advance of any non-emergency or scheduled medical care he has on the Medical Campus," and defining "Medical Campus" as "Southcentral Foundation including the Alaska Native Medical Center or Hospital."  When the DVPO was issued for another year on December 31, 2014, it contained a nearly identical provision:  "Harrison is required to notify security of Southcentral Foundation at least one day in advance of any non-emergency or scheduled medical care he has on the Alaska Native Medical Campus; or if he will be escorting his mother on campus."[4]  The DVPO also required Harrison to "authorize Southcentral Foundation and Alaska Native Medical Campus to notify Deanna Smith when . . . he will be on campus either for his own appointment or to escort his mother."[5]  The order extending the DVPO through 2016 had the same provisions.

---

[4] Smith characterizes the DVPO's requirement of notice "at least one day in advance" as a requirement of at least 24 hours' notice, as opposed to simply notice the day before.  Interpreting the language one way or the other is not necessary to our decision.

[5] The record does not indicate whether Harrison ever provided the required authorization, as Southcentral's security officers testified that they were unsure what information about Harrison's medical appointments they could disclose to Smith

The chronological notes compiled by Harrison's parole and probation officers acknowledge his dangerous history, including not just the underlying crime but also threats he made against Smith shortly after his release from prison in April 2014. The notes also reflect the officers' periodic instruction to Harrison over the ensuing years that he was to inform them, as well as Southcentral security, "prior to" or "the day before" going to the medical campus for any reason.[6] According to Farrar, her requirement was that Harrison give her prior notice: "He doesn't have to give me a day's notice. He could have e-mailed me the same day. . . . The day's notice only applied to ANMC."

### 2. Harrison's visits to the medical campus and Smith's allegations of DVPO violations

Smith alleges that Harrison violated the DVPO's notice provision a number of times by failing to provide 24 hours' notice to Southcentral security before coming to the medical campus. She alleges that Harrison violated the DVPO at least 20 times, with a particularly "intense period in April and May 2016."[7]

---

without violating federal law. *See* Health Insurance Portability and Accountability Act (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of 18, 26, 29, and 42 U.S.C.); *Harrold-Jones v. Drury*, 422 P.3d 568, 570-73 (Alaska 2018) (summarizing HIPAA's protective scope and exceptions).

[6] *See, e.g.*, June 16, 2014 entry: "D[efendant] reminded he needs to contact PO prior to going to ANMC, stay in the area of his [appointment], and provide documentation"; September 9, 2014 entry: "PO instructed this defendant that if he needed to go to ANMC, he is to call the day before he goes to notify PO"; March 16, 2016 entry: "[Defendant] will continue to coordinate with security and assigned PO when he will be on the [medical] campus."

[7] This time period is the focus of Smith's briefing on appeal. Other than the three incidents in 2015 and 2016 discussed below, the only allegations that involve Harrison's visits to the medical campus were in April, May, and November 2014, April 2015, and February 2016. The 2014 allegations precede the amendment of the long-term DVPO to add the requirement of prior notice to Southcentral and Farrar's

Smith's focus is on three incidents in 2015 and 2016 when the Anchorage Police Department (APD) became involved. She alleges that in January 2015 she saw Harrison in the lobby of one of the medical campus buildings, "was terrified," and called APD. Southcentral security confirmed that it had not received notice of a visit that day, and APD contacted Harrison's then-probation officer to ask about the DVPO's conditions. The probation officer's notes reflect that she called Harrison in the next day, and he denied having been at the medical campus. The probation officer instructed him "that he needs to keep a log of anytime he enters the hospital for any reason," and he gave her the dates of upcoming visits. The officer's notes also reflect that APD was "going to check the video tapes to see if the defendant entered the hospital"; the police ultimately did not pursue charges.

Smith next alleges that Harrison gave insufficient notice to Southcentral on March 30, 2016, notifying security at approximately 10:00 a.m. that he would be on campus later that day for a 2:30 p.m. appointment. APD was called the next day and investigated the incident. According to the police report, Farrar, who had assumed responsibility for Harrison's case the previous January, informed APD that Harrison "contacts her via email or phone when he or his mother have appointments at the medical campus" and "that she received two emails from him about the appointment on 3/30/2016 and in the email he informed her that he had called security and notified them of the appointment."[8] Ultimately, the investigating APD officer "was unable to verify that the violation [of the DVPO] had actually taken place," and he was advised by the

appointment as Harrison's probation officer. There is no evidence Farrar was informed of either the April 2015 incident (when Smith "witnessed Harrison's vehicle again parked next to hers at her workplace") or the February 2016 incident (when Smith "encountered Harrison's mother, whom he had been escorting to appointments, at her workplace").

[8] Our record contains only one email from Harrison to Farrar before the appointment, but there is also a follow-up email from Harrison the day after.

municipal prosecutor's office that "without an admission from [Harrison,] [there] was not sufficient evidence to charge him." Farrar's own notes reflect that she spoke to the investigating APD officer on April 1, and "with investigation it does NOT appear the def[endant] violated any part of the DV[P]O." She concluded: "From what information has been given so far the def[endant] is in compliance."

The next incident Smith points to occurred several days later, on April 4, when she received notice at approximately 10:00 a.m. of Harrison's 11:00 a.m. medical appointment. Smith called APD to report this as a violation of the DVPO, and two officers responded. As part of their investigation, the APD officers interviewed Southcentral security as well as Harrison. The police officers also spoke with an assistant district attorney, who advised them that he believed Harrison was following the DVPO and should not be arrested. Once again APD "did not find any crimes had been committed."

Harrison emailed Farrar to inform her of this contact with APD. The next day Farrar called the assistant district attorney herself to discuss the police reports on the March 30 and April 4 incidents; her notes reflect her conclusion that "there is still no crime or violation of the DV[P]O or probation conditions." But Farrar did reiterate in her case notes that Harrison "will still need to email or call [his probation officer] about his or his mother['s] medical [appointments] at ANMC; as well as notify ANMC security."

In March 2016 Smith applied for leave under the Family and Medical Leave Act due to the strains on her mental health, and by May her "symptoms were such that she could no longer function at work." The parties agree that Harrison filed a pro se request for early termination of his probation in late 2016, that Farrar recommended early termination, and that Smith opposed it; they also agree that an April

2017 search of Harrison's residence found items prohibited by his terms of release[9] and that a probation officer filed a petition to revoke Harrison's probation the day after the search.

## B. Proceedings

Smith filed suit in January 2018 against Farrar and DOC, alleging that both were negligent in their supervision of Harrison and that DOC was negligent in its supervision of Farrar.[10] Smith alleged that Farrar and the State breached their duties of care by "failing to appropriately supervise Harrison, failing to investigate his parole violations, failing to search his residence, and failing to follow Department of Corrections policies governing supervision of parolees." She alleged that these breaches of duty caused her such severe emotional distress that she had to seek mental health treatment and was eventually unable to work, losing her job at Southcentral as a result.

The State moved for summary judgment. It argued that it did not breach its duty of reasonable care in its supervision of Harrison because Farrar never had probable cause to believe he had committed a "serious violation" of his probation conditions that would require her to initiate revocation proceedings. The State also argued that regardless of whether it satisfied its duty of care, Smith's suit was barred by discretionary function immunity.

Smith opposed the motion, arguing that there were factual disputes over whether Farrar had adequately investigated each alleged violation and whether she had

---

[9] These included a crossbow and arrows, a bottle of beer, and a urinalysis test strip.

[10] The State was later substituted as a defendant with regard to the claims against Farrar. *See* AS 09.50.253(c) (allowing substitution upon attorney general's certification "that the state employee was acting within the scope of the employee's office or employment at the time of the incident out of which the claim arose").

probable cause to believe a serious violation had occurred. Smith argued that Farrar's actions were not entitled to immunity because Harrison's repeated visits to the medical campus with inadequate notice necessarily amounted to a "serious violation" of his probation conditions, and a probation officer has a nondiscretionary duty to revoke probation for a "serious violation."

The court granted summary judgment for the State, concluding that Farrar had fulfilled her duty of care. The court discussed discretionary function immunity only briefly, stating that "the evidence supports the [State's] contention that [Farrar] maintained the discretion to act in the way [she] chose, thus discretional [sic] immunity [applies.]"[11] The court entered judgment against Smith and awarded attorney's fees to the State under Alaska Civil Rule 82. Smith appeals.

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo, applying our independent judgment and adopting the rule 'that is most persuasive in light of precedent, reason, and policy.' "[12] "Summary judgment 'is affirmed if the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' "[13] "When making this determination, we draw all reasonable inferences in favor of the non-moving party."[14]

---

[11] Smith filed a motion for reconsideration which the court did not address and which was therefore deemed denied. Alaska R. Civ. P. 77(k)(4).

[12] *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007) (first citing *Charles v. Interior Reg'l Hous. Auth.*, 55 P.3d 57, 59 (Alaska 2002); and then quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[13] *Id.* (quoting *Dayhoff v. Temsco Helicopters, Inc.*, 848 P.2d 1367, 1369 (Alaska 1993), *overruled on other grounds by Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595 (Alaska 2021)); *see also* Alaska R. Civ. P. 56(c).

[14] *Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 630 (Alaska 2001) (quoting *Parson v. Marathon Oil Co.*, 960 P.2d 615, 618 (Alaska 1998)).

"[T]he existence and extent of a duty of care" and "[w]hether a governmental act is entitled to discretionary function immunity" are also matters of law reviewed de novo,[15] as is the existence or absence of probable cause.[16]

## IV.   DISCUSSION

### A.   Our Decisions In *Neakok* And *Cowles* Direct The Outcome Of This Case.

We addressed the State's liability for its officers' negligent supervision of parolees in two cases, *Division of Corrections v. Neakok*[17] and *State, Department of Corrections v. Cowles*.[18]   In *Neakok* and *Cowles* we discussed both the scope of the parole officers' duty[19] and the applicability of statutory immunity,[20] and the two cases direct our decision here.[21]

*Neakok* involved a claim against the State by relatives of three persons murdered by a man who was on supervised mandatory parole after serving time for rape and assault.[22]   The plaintiffs claimed that the State was negligent for "failing to impose special conditions of release at the time of [the parolee's] release, to supervise [the

---

[15]   *State, Dep't of Corr. v. Cowles*, 151 P.3d 353, 358 (Alaska 2006).

[16]   *Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007) ("Once the historical facts have been established, the existence or absence of probable cause is 'a purely legal question' that we review de novo." (quoting *In re J.A.*, 962 P.2d 173, 175 (Alaska 1998))).

[17]   721 P.2d 1121, 1125-37 (Alaska 1986), *overruled in part by Cowles*, 151 P.3d at 360.

[18]   151 P.3d at 358-65.

[19]   *Neakok*, 721 P.2d at 1125-32; *Cowles*, 151 P.3d at 362-65.

[20]   *Neakok*, 721 P.2d at 1132-35; *Cowles*, 151 P.3d at 358-62.

[21]   Because Neakok and Cowles were parolees, these cases necessarily refer to parole.  But as discussed at note 3, *supra*, the duties of probation and parole officers do not differ in any way meaningful to our analysis.

[22]   *Neakok*, 721 P.2d at 1123.

parolee] adequately while he was on parole, in allowing him to return to a small, isolated community without police officers or alcohol counseling[,] and in failing to warn his victims of his dangerous propensities."[23]

First addressing whether the State owed a duty to the parolee's victims, we considered the so-called "*D.S.W.* factors"[24] for determining the existence of such a duty, concluding that the most important factor was foreseeability.[25] We held that the State's long history with the parolee as a prisoner and its authority over him as a parolee meant that there was "a special relationship" between them, "both because of [the State's] increased ability to foresee the dangers the parolee poses and because of its substantial ability to control the parolee."[26] We continued: "Given this special relationship, it is not unreasonable to impose a duty of care on the [S]tate to protect the victims of parolees."[27] And the victims in *Neakok* — one of the parolee's stepdaughters, her boyfriend, and her aunt — were reasonably foreseeable given the parolee's history of violence toward family members and the fact that "[a]ll three were residents of an isolated community of fewer than 100 residents into which [the parolee] was released."[28] Whether the State breached its duty of care to these victims "by failing

---

[23] *Id.*

[24] *Id.* at 1125 (describing factors adopted in *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981), which "include foreseeability of harm, the closeness of connection between the defendant's conduct and the plaintiff's injury, the moral blame attached to the defendant's conduct, the policy of preventing further harm, the extent of the burden to the defendant and consequences to the community of imposing a duty of care, and the availability, cost and prevalence of insurance for the risk involved").

[25] *Id.*

[26] *Id.* at 1126.

[27] *Id.* at 1126-27.

[28] *Id.* at 1128-29.

to supervise [the parolee] more closely, to impose special conditions of parole, to warn the residents of [his community] of his dangerous propensities, or to take other protective measures" remained a question of fact for a jury to decide.[29]

We then considered whether the State in *Neakok* was nonetheless entitled to "discretionary function" immunity under AS 09.50.250.[30] This statute provides that no one may bring a tort action against the State "based upon the exercise or failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."[31] We applied the "planning-operational test" to determine whether the State actions at issue were immune: "Under this planning-operational test, only decisions that rise to the level of basic planning or policy formulation will be considered discretionary; decisions that implement policy decisions and are ministerial or operational in nature will not be immune."[32] We decided that the plaintiffs' claims against the State were "based primarily on day-to-day acts of corrections personnel" that were operational rather than policy-making: formulating a parole plan (to include the selection of special conditions regarding alcohol consumption, rehabilitation programs, and residence); supervising the defendant; and "deciding not to appoint a parole liaison advisor, not to inform appropriate people in the small community . . . of [the defendant's] parole status, and not to warn his stepdaughter and other potential victims of his dangerous propensities."[33] We held that these sorts of decisions by parole officers "took place 'at

---

[29]     *Id.* at 1132.

[30]     *Id.* at 1132-35.

[31]     *Id.* at 1132 (quoting former AS 09.50.250(1) (1965)). While this statute has been amended since *Neakok*, the relevant language remains the same. AS 09.50.250(1).

[32]     *Neakok*, 721 P.2d at 1133.

[33]     *Id.* at 1133-34.

the lowest, ministerial rung of official action,' and cannot be immunized."[34]  It was therefore up to the jury to determine whether the decisions were negligent:  "If these decisions were made reasonably and carefully, the [S]tate will not be held liable even if, in retrospect, an alternative decision may have averted the murders."[35]

We considerably narrowed *Neakok*'s holding 20 years later in *Cowles*.[36] That case involved a defendant released on mandatory parole who killed himself and his girlfriend while still under parole supervision.[37]  The girlfriend's personal representative sued DOC for "negligence by failing to implement and enforce an appropriate parole plan, to require appropriate post-release therapy, to enforce parole violations, to properly supervise [the parolee], and to revoke his parole."[38]  The State moved for summary judgment, urging that "*Neakok* should be overruled and therefore that the State owes no duty of care to victims of crimes committed by parolees."[39]  The superior court denied the motion, and we accepted the State's petition for review.[40]

We declined to overrule *Neakok*'s holding "that the State has an actionable duty of care in supervising parolees."[41]  Acknowledging the significant policy concerns that militate against such a duty — for example, that it "could lead the State to err on

---

[34]  *Id.* (internal citations omitted) (quoting *Tarasoff v. Regents of the Univ. of Cal.*, 551 P.2d 334, 350 (Cal. 1976), *superseded by statute*, Cal. Civ. Code § 43.92, *as recognized in Shalghoun v. N. L.A. Cnty. Reg'l Ctr., Inc.*, 317 Cal. Rptr. 3d 641 (Cal. App. 2024).

[35]  *Id.* at 1135.

[36]  151 P.3d 353 (Alaska 2006).

[37]  *Id.* at 356-57.

[38]  *Id.* at 357.

[39]  *Id.*

[40]  *Id.*

[41]  *Id.* at 364.

the side of continued detention to avoid liability" — we concluded that the availability of "discretionary function immunity for policy decisions will protect the State's rehabilitative goals while encouraging parole officers to carry out their mandated operational duties in a non-negligent manner."[42]

On the subject of discretionary function immunity, however, we decided that *Neakok* had gone too far, specifically in ruling that " '[f]ormulation of [a] parole plan, and selection of special [parole] conditions' are not planning activities entitled to immunity."[43] Citing DOC policies, we concluded that parole officers had no discretion, "and thus no immunity," when faced with probable cause that the defendant has committed a "serious violation," a term encompassing felonies, class A misdemeanors, and "technical violations that constitute a criminal act or jeopardize the property or safety of another person."[44] But parole officers did retain discretion to decide whether certain misdemeanors or technical violations should instead be classified as "minor violations" that did not justify the revocation of parole, because the decision whether to revoke parole involved the weighing of such policy considerations as "public safety, the need to rehabilitate and reintegrate offenders, the allocation of resources available to treat and supervise parolees, and potential prison overcrowding."[45] We concluded, therefore, that the parole officer's "decision not to pursue revocation in response to [the

---

[42]    *Id.*

[43]    *Id.* at 360 (alterations in original) (quoting *Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok*, 721 P.2d 1121, 1134 (Alaska 1986)).

[44]    *Id.* at 360-61; *see also* Alaska Dep't of Corr. Pol'ys & Proc., *920.01: Community Corrections Definitions*, DEP'T OF CORR.: OFF. OF THE COMM'R (last visited Aug. 19, 2024), https://doc.alaska.gov/commissioner/policies-procedures (to view this policy, under subheading "Policies & Procedures" select "Probation & Parole" and then "Chapter 920 – Definitions").

[45]    *Cowles*, 151 P.3d at 359-60 (reciting policy considerations relevant to parole board's discretionary decision-making); *id.* at 361 (concluding that parole officer's decision-making "involves the same weighing of policy matters").

parolee's] technical violations" was an exercise of judgment protected by discretionary function immunity.[46]

Not entitled to immunity, however, were "[t]he day-to-day supervisory activities of a parole officer, such as filling out risk assessment scales and investigating the apparent commission of a serious violation."[47] "Discretionary function immunity does not apply to these activities because a parole officer is not required to choose between competing policy concerns in performing these duties, but merely to exercise some judgment in carrying out established DOC directives."[48] But we cautioned that the duty to investigate arises only with regard to parole violations of which the parole officer has notice, because "seeking out possible parole violations of which the parole officer has no notice" involves "policy judgments in deciding how to allocate time and resources among various clients" and therefore falls within the scope of discretionary function immunity.[49]

In light of the holding in *Neakok* as narrowed in *Cowles*, Smith argues that Farrar's failure to investigate Harrison's alleged violations of his probation conditions is not an immune discretionary decision because she had notice — of both the DVPO and Harrison's repeated violations of its terms — sufficient to require her to investigate further. She argues that further investigation would have revealed to Farrar the extent of Harrison's violations and that those violations were serious, necessitating a violation report and a petition to revoke Harrison's probation.

But we disagree. As explained below, there is evidence that Farrar learned of several of the possible DVPO violations Smith identifies, but the evidence also shows

---

[46] *Id.* at 361.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 362.

that she performed her operational duty of investigating them, and her conclusion that she lacked probable cause to find a violation was a reasonable one. Her subsequent decisions — whether to investigate further or take other action — were protected by discretionary immunity.

**B.    Farrar Performed Her Operational Duty To Investigate Alleged Violations Of Which She Was Aware; Her Subsequent Decisions Are Protected By Discretionary Function Immunity.**

Before we decide whether statutory immunity applies, we first determine whether "a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity."[50] Such a duty exists here. As we held in *Neakok* and affirmed in *Cowles*, the State has a duty to exercise due care in supervising probationers,[51] and this duty is owed to the probationer's foreseeable victims, whether "a particular individual or [an] identifiable group."[52] Smith, like the victims in *Neakok* and *Cowles*, was a foreseeable victim.[53] Because the State does not dispute that it owed Smith a duty of care, the determinative issue for purposes of summary judgment was whether discretionary function immunity applied.

Smith argues that Farrar was negligent both because she failed to investigate alleged violations of the probation conditions and because she failed to conclude that they were serious enough to require action. These arguments invoke

---

[50] *Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986) (quoting *Davidson v. City of Westminster*, 649 P.2d 894, 896 (Cal. 1982)), *overruled in part on other grounds by Cowles*, 151 P.3d 353.

[51] *Cowles*, 151 P.3d at 363-64.

[52] *Id.* at 363; *see also Neakok*, 721 P.2d at 1129 ("We agree with those courts which have held that the inability to predict the special victim of a dangerous person does not absolve a custodian from a duty to use due care to protect others who might foreseeably be endangered by that person.").

[53] *See Neakok*, 721 P.2d at 1129; *Cowles*, 151 P.3d at 363-64.

different applications of the discretionary immunity analysis, and we discuss them in turn below.

> **1.    There is no evidence that Farrar failed to investigate alleged violations of probation conditions that were brought to her attention.**

DOC policy provides that probation officers "shall investigate all allegations of violations of the conditions of supervision."[54] A probation officer has no discretion whether to perform this duty; she must investigate.[55] As noted above, discretionary function immunity does not apply to this duty.[56] In *Cowles*, a parolee reported to his parole officer that the police had come to his house to arrest him.[57] The parole officer allegedly "took no action to find out from the police why they had tried to arrest [the parolee]."[58] We held that because parole officers have no discretion as to *whether* to investigate, the officer's potential failure to follow up meant that the State was not entitled to summary judgment and immune from suit.[59] We also emphasized,

---

[54]    Alaska Dep't of Corr. Pol'ys & Proc., *902.14: Violation Of Supervision Conditions* (effective Nov. 27, 2002) (on file with the court). This was the policy in effect during the time period in question. It was repealed on January 1, 2017, and replaced by DOC Policy 902.16. Alaska Dep't of Corr., Pol'ys & Proc., *902.14: Violation Of Supervision Conditions*, DEP'T OF CORR.: OFF. OF THE COMM'R (Jan. 1, 2017), https://doc.alaska.gov/pnp/pdf/902.14.pdf (noting DOC Policy 902.14 incorporated into DOC Policy 902.16).

[55]    *Cowles*, 151 P.3d at 361.

[56]    *Id.* ("Discretionary function immunity does not apply to these activities because a parole officer is not required to choose between competing policy concerns in performing these duties, but merely to exercise some judgment in carrying out established DOC directives.").

[57]    *Id.* at 357.

[58]    *Id.*

[59]    *Id.* at 361-62 (noting that "[i]ssues of material fact preclude summary judgment for the State on this issue" because "there is a question of fact as to what

however, that the State cannot be liable for a parole officer "failing to take affirmative action to discover parole violations of which she had no notice."[60]

Violating a DVPO is a crime.[61] A violation of the DVPO in this case would also be a violation of Harrison's probation conditions because of the requirement that he obey all laws and special instructions of the court. But Smith does not dispute Farrar's testimony that as a probation officer she was authorized to investigate only probation violations, not new crimes. Instead of investigating an alleged crime herself, she was required to notify local law enforcement of information that could lead to new criminal charges and await the results of their investigation before looking into any corresponding violation of probation conditions. And that appears to be what she did. At her deposition she acknowledged receiving "calls from APD saying there was an alleged violation of a DV[P]O, and [that she] also got their reports that said . . . they didn't charge any crime. They didn't find enough evidence to say there was a new crime." The evidence supports the State's position that after learning of the alleged violations in April 2016, Farrar investigated them: she spoke with the investigating officers and the assigned prosecutor and learned that APD had already concluded there was no probable cause to arrest Harrison.

Other than the two 2016 incidents involving police contacts, Farrar testified: "No one ever contacted m[e] telling me [that] they never got [the] notice [required by the DVPO] . . . . As for talking to Ms. Smith, she never called me." Smith

---

happened at the meeting at which [the parolee] gave [the officer] the monthly report stating that the police had come to arrest him").

[60] *Id.* at 362 (adopting dissent of Matthews, J., in *Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok*, 721 P.2d 1121, 1137 (Alaska 1986)).

[61] *See* AS 11.81.900(b)(11) (" '[C]rime' means . . . a felony or a misdemeanor."); AS 11.56.740(a)-(b) (defining "crime of violating a protective order" and classifying it as class A misdemeanor).

cites a number of other instances when Harrison failed to give Southcentral security the required notice (i.e., "at least one day in advance"), supporting her argument with the security employees' deposition testimony.[62] But there is no evidence Farrar knew about these concerns at the time. Her notes indicate that when Harrison gave her the prior notice she required of him, he usually told her that he had already contacted Southcentral security or would do so shortly.

At her deposition Farrar explained that she did not confirm Harrison's representations with Southcentral security because she "had not gotten any information or an inkling from anyone else, from the victim or anybody [else], that [Harrison] was not doing what he was supposed to be doing." Again, there is nothing in the documentary record to contradict her testimony.

In sum, the State cannot be liable for a probation officer's failure "to take affirmative action to discover [probation] violations of which she had no notice."[63] There is no evidence that Farrar knew of alleged violations that would prompt her to investigate beyond those few that were brought to her attention because of APD's involvement — and she investigated them.

---

[62] Southcentral's safety manager testified that "there were several instances where [Harrison] didn't contact us and showed up on campus" and "other times where he contacted the hospital security program instead of notifying us [at Southcentral]," which in the witness's view showed an intent "to play the system." The superior court, in granting the State's motion for summary judgment, discussed the incidents involving APD and concluded that "no evidence had been presented showing any other violations" by Harrison, and "[t]he evidence presented . . . indicate[s] that Harrison followed the requirements of the DVPO." Although this finding is contradicted by the record, it is not the number of DVPO violations that is relevant here but rather the number of which Farrar was aware.

[63] *Cowles*, 151 P.3d at 362.

**2. Once she investigated and found no probable cause, Farrar's subsequent decisions were protected by discretionary immunity.**

A probation officer investigating alleged violations of supervision conditions must determine whether there is probable cause to conclude that a violation has occurred; if there is, the officer must decide whether the violation is serious or minor.[64] The applicable probable cause standard is the same one applied by other law enforcement officers.[65] "Probable cause to arrest exists if the totality of the circumstances known to the officer would support a reasonable belief that an offense has been or is being committed."[66] We review an officer's probable cause determination "under an objective standard without regard to the officer's subjective intent."[67]

To decide whether Farrar had probable cause to conclude that Harrison had violated his probation conditions, we therefore consider "the totality of the circumstances known to [her]."[68] We first observe that Harrison's offender history included references to his dangerousness, including the threats he made to Smith after being released from prison in April 2014. The history also includes the police contact in January 2015, when Farrar's predecessors investigated Smith's claim that she saw Harrison in a building lobby on the medical campus and called APD to report that he had failed to give the required notice. The probation officers assigned at the time spoke

---

[64] Alaska Dep't of Corr. Pol'ys & Proc., *902.14: Violation Of Supervision Conditions* (effective Nov. 27, 2002) (on file with the court) ("Violations of supervision conditions will be investigated, and classified as serious or minor," and the "Probation Officer will determine the appropriate response.").

[65] *See id.*

[66] *Simpson v. State*, 489 P.3d 1181, 1185 (Alaska App. 2021).

[67] *Yi v. Yang*, 282 P.3d 340, 347 (Alaska 2012).

[68] *Simpson*, 489 P.3d at 1185.

with APD and Harrison about the incident; ultimately Harrison was not arrested or charged. Farrar took over the file a few weeks later.

The first mention of "Victim contact" in Farrar's own notes occurs over a year later, in February 2016, when she asked Harrison "if he had any contact with the victim whatsoever" and he "denied all contact," explaining the notification process he followed when visiting the medical campus. The next relevant dates are in early April 2016, when Farrar learned of APD's investigation of the March 30 and April 4 incidents. As described above, Farrar spoke to the investigating officer about the March 30 incident and to the assigned prosecutor about both incidents; the prosecutor informed Farrar that he had been "briefed by the officer . . . that there was a report last week as well . . . [b]ut there is still no crime or violation of the DV[P]O or probation conditions."

Farrar made the same decision: that there were no violations of Harrison's probation conditions requiring further action. Given what she knew (or should have known from the offender history) — that Harrison had made serious threats in the past, that he had nonetheless apparently complied with the DVPO conditions for over a year, that APD had investigated the March and April allegations and found insufficient evidence to charge a new crime — we cannot say that her decision was legally incorrect. And once having investigated and determined that there was no probable cause to find a violation of probation conditions, Farrar had fulfilled her operational, nondiscretionary duty and was not required to take further action.[69]

---

[69] Smith argues that Harrison's actions were serious violations, as defined in the regulations, because they jeopardized her property or safety. *See* Alaska Dep't of Corr. Pol'ys & Proc., *920.01: Community Corrections Definitions*, DEP'T OF CORR.: OFF. OF THE COMM'R (last visited Aug. 19, 2024), https://doc.alaska.gov/commissioner/policies-procedures (to view this policy, under subheading "Policies & Procedures" select "Probation & Parole" and then "Chapter 920 – Definitions"). If a violation is serious, the probation officer "has no discretion, and thus no immunity, in responding to felony behavior or other actions that jeopardize the

We acknowledge that a different probation officer could have taken a different tack: she could have decided not to rely on APD's conclusions and the prosecutor's advice but instead to investigate further on her own. But such a decision about whether to expand or extend an investigation's scope — as opposed to whether the investigation should be undertaken at all — is one usually left to the discretion of the investigating agency.[70] The depth and duration of an investigation implicate the same considerations that animated our decision in *Cowles* that a parole officer's decision not to "seek[] out possible parole violations of which the parole officer has no notice involves planning decisions that are entitled to discretionary function immunity."[71] Whether Farrar would rely on the conclusion of other law enforcement officers, or whether she would instead follow up with further investigation of her own,

---

property or the safety of another person; in such cases the officer is simply executing a pre-existing policy." *State, Dep't of Corr. v. Cowles*, 151 P.3d 353, 361 (Alaska 2006). We acknowledge that minor violations could cumulatively amount to a serious one, especially in the context of DVPOs, which often address a series of unwanted contacts that may be individually innocuous but that add up to harassment or a credible threat to safety. *See*, *e.g.*, AS 11.41.260 (defining crime of stalking in the first degree and citing AS 11.41.270, which defines stalking in the second degree). However, because Farrar reasonably believed that she lacked probable cause to conclude that violations had occurred, it is not necessary for us to determine whether such violations would have been properly classified as minor or serious.

[70] *See Alaska State Comm'n on Hum. Rts. v. Anderson*, 426 P.3d 956, 964 (Alaska 2018) ("Any administrative agency empowered to investigate complaints and allegations of wrongdoing must have a broad discretion if it is to function at all." (quoting *In re Nowell*, 237 S.E.2d 246, 252 (N.C. 1977))); *Yankee v. City & Borough of Juneau*, 407 P.3d 460, 464 (Alaska 2017) ("Generally, courts decline to review executive-branch decisions *not* to prosecute an individual or *not* to enforce a law under particular circumstances." (emphasis in original)); *see also Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000) ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive.").

[71] *Cowles*, 151 P.3d at 362.

presumably involved "policy judgments in deciding how to allocate time and resources among various clients," balancing "the interests of public safety and rehabilitation of offenders when deciding how much time to devote to seeking out potential parole violations as opposed to assisting clients with housing, rehabilitation, and other needs."[72]

Thus, once Farrar investigated the alleged violations of which she had notice and found no probable cause that violations had occurred, the rest of her response involved discretionary planning decisions that are immune from suit, even if we were to view them as wrongheaded. "In this way, discretionary function immunity 'ensures that courts do not step into the policy roles committed to other branches of government.' "[73] Accordingly, the superior court properly granted summary judgment to the State on Smith's claims.[74]

---

[72] *Id.*

[73] *Id.* at 359 (quoting *Kiokun v. State, Dep't of Pub. Safety*, 74 P.3d 209, 215 (Alaska 2003)).

[74] In her opposition to the State's motion for summary judgment and in her opening brief on appeal, Smith alludes to violations of the requirement of prior notice to the probation officer but does not develop them into a separate argument, focusing instead on violations of the requirement of prior notice to Southcentral security. She develops the argument about inadequate notice to Farrar more fully in her reply brief. We do not address the argument separately except to note that the analysis is similar. "Violations of supervision conditions other than law violations" are by definition "minor violations." Alaska Dep't of Corr. Pol'ys & Proc., *920.01: Community Corrections Definitions*, DEP'T OF CORR.: OFF. OF THE COMM'R (last visited Aug. 19, 2024), https://doc.alaska.gov/commissioner/policies-procedures (to view this policy, under subheading "Policies & Procedures" select "Probation & Parole" and then "Chapter 920 – Definitions"). Had Farrar concluded that Harrison was not giving her adequate notice of his visits to the medical campus, it would be by definition a "minor violation" which the probation officer is required to "attempt to resolve . . . without filing a probation or parole violation report," employing less serious measures such as "counseling, behavior contracts, letters of warning, or other appropriate means."

## V.    CONCLUSION

The judgment of the superior court is AFFIRMED.

---

Alaska Dep't of Corr. Pol'ys & Proc., *902.14:  Violation of Supervision Conditions* (effective Nov. 27, 2002) (on file with the court).